## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **DEBRA LOFTIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO:** |
| | ) | **3:06-CV-839-WKW** |
| **U.S. LABS - FOUNTAIN VALLEY,** | ) | |
| **INC., and ESOTERIX, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

COME NOW, Defendants, U.S. Labs Fountain Valley, Inc., ("U.S. Labs") and Esoterix, Inc., ("Esoterix"), and submit this brief in support of their Motion for Summary Judgment.

## I.    STATEMENT OF THE CASE

Plaintiff initially filed her complaint on September 19, 2006. Plaintiff asserts one claim for negligence in her complaint in which she asserts that defendants negligently performed certain Fluorescence In Situ Hybridization analyses on her specimens and reported the results as abnormal. Defendants have answered the complaint, generally denied its allegations, and asserted various affirmative defenses. Discovery has been completed and presently pending before the Court is defendants' Motion for Summary Judgment.

## II.    STATEMENT OF THE FACTS

### A.    Fluorescence In Situ Hybridization (FISH)

1.    Detection of bladder cancer is difficult because there is not a laboratory test that gives a positive result for all patients with cancer (sensitive), while being negative for all patients without cancer (specific).  Historically, the gold standard screening test for bladder cancer was  cytology (microscopic examination of cells in urine).  This test only suggests bladder cancer in approximately 60% of cases with bladder cancer, thus the test is not very sensitive. (Dr. Wolff Expert Report ¶ 3).[1]

2.    The UroVysion FISH test was FDA approved in 2001 for monitoring for bladder cancer in patients with a previous diagnosis of bladder cancer and approved for evaluation of patients with symptoms suggestive of bladder cancer in 2005.  The test was adopted by laboratories because the test was much more sensitive than cytology and allowed for the identification of approximately 89% of patients with bladder cancer.  However, it is recognized that UroVysion was not 100% specific and approximately 10% to 20% of patients with a positive result did not have detectable cancer.  (Dr. Wolff Expert Report ¶ 3).

3.    The FISH test is comprised of four DNA probes that are used to detect genetic abnormalities in cells from the urogenitial system.  The probes are not

---

[1]    The Declaration of Daynna J. Wolff, Ph.D. and attached Expert Report are attached as Ex. 1 to Defendants' Evidentiary Submission.

specific for genes that are known to be associated with bladder cancer, but the DNA probes target general areas on the chromosomes and are used to mark cells with an abnormal chromosome count.  (Dr. Wolff Expert Report ¶ 3).

4.     The upper urinary tract is difficult to evaluate and the UroVysion FISH test has been shown to be particularly useful for screening for cancers in the problematic area.  (Dr. Wolff Expert Report ¶ 7).

5.     The UroVysion FISH test is an ancillary test designed to aide in the diagnoses of bladder carcinoma in patients with hematuria and help the monitoring of carcinoma recurrence.  This test is not a diagnostic method.  The results have to be interpreted by experienced or qualified urologists or urological pathologists for further clinical diagnoses or workup.  (Dr. Yue Expert Report ¶ 4).[2]

**B.     Plaintiff**

6.     In  the summer of 2005, plaintiff was 49 years of age.  (Plt. Depo., p. 6, ln. 8-12).[3]

7.     In December, 2004, plaintiff and her husband moved to Jackson Gap, Alabama.  (Plt. Depo., p. 7, ln. 19 - p. 8, ln. 13).

---

[2]     The Declaration of Changjun Yue, M.D, Ph.D. and attached Expert Report are attached as Ex. 2 to Defendants' Evidentiary Submission.

[3]     The Deposition of Plaintiff Debra Loftin is attached as Ex. 3 to Defendants' Evidentiary Submission.

8.     Plaintiff  previously secured a GED from the State of Georgia  (Plt. Depo., p. 12, ln. 9-11), and historically has worked as a teacher's assistant.  (Plt. Depo., p. 22, ln. 1-10, p. 28, ln. 11-15).

9.     In early August 2005, plaintiff started her job as a teacher's assistant at Dadeville Elementary.  (Plt. Depo., p. 24, ln. 17-21, p. 25, ln. 16 - p. 26, ln. 4).

10.     Plaintiff has a complex medical history and has experienced numerous health conditions over the course of her lifetime including: pain in the lower abdomen (Plt. Depo., p. 36, ln. 16 - p. 37, ln. 3), bladder problems (Plt. Depo., p. 44, ln. 15 - p. 45, ln. 9), problems with urinating, frequency problems with urinating (Plt. Depo., p. 36, ln. 1 - p. 37, ln. 10, p. 44, ln. 21 -p. 45, ln. 3), burning problems while urinating (Plt. Depo., p. 36, ln. 1 - p. 37, ln. 10, p. 44, ln. 21 - p. 45, ln. 3), urinary tract infections (Plt. Depo., p. 44, ln. 18 - p. 45, ln. 3), depression (Plt. Depo., p. 37, ln. 11-20), adverse reactions to various prescribed medications (Plt. Depo., p. 41, ln. 2 - p. 42, ln. 2), swelling in her abdomen (Plt. Depo., p. 45, ln. 4-9), acid reflux (Plt. Depo., p 42, ln. 6-9), pelvic pain (Plt. Depo., p. 42, ln. 10 - p. 43, ln. 14), blood in her urine (Plt. Depo., p 45, ln. 10-17), diarrhea (Plt. Depo., p. 45, ln. 18 - p. 46, ln. 6), rectal bleeding (Plt. Depo., p. 45, ln. 21 - p. 46, ln. 6), and gallbladder removal (Plt. Depo., p. 46, ln. 7-21).

### C.    Dr. Mockler

10.    In April of 2005, plaintiff went to see a primary physician Dr. Mockler.  (Plt. Depo., p. 34, ln. 16-21).

11.    Plaintiff visited Dr. Mockler because she was experiencing pain in her lower abdomen and problems of frequency and burning with respect to urination. (Plt. Depo., p. 34, ln. 22- p. 36, ln. 15, p. 52, ln. 16-23).

12.    Additionally, plaintiff had been taking Zoloft for five years for depression, she stopped taking Zoloft in April, 2005 and was experiencing various related difficulties.  (Plt. Depo., p. 38, ln. 21 - p. 40, ln. 12).

13.    Dr. Mockler referred plaintiff to Dr. Bauer, a urologist.  (Plt. Depo., p. 35, ln. 10-12).

### D.    Dr. Bauer

14.    Plaintiff began treatment by Dr. Bauer based on her complaints of blood in her urine and lower abdominal pain.  (Plt. Depo., p. 53, ln. 1-22).

15.    On May 23, 2005, Dr. Bauer collected a urine specimen for use in a FISH analysis.  (Plt. Depo., p 53, ln. 12-23).  That specimen was forwarded to U.S. Labs' facility in Fountain Valley, California for analysis.  (05/23/05 U.S. Labs Report).[4]  U.S. Labs reported that the specimen was abnormal.  (Id.).[5]

---

[4]    05/23/05 and 06/07/05 U.S. Labs Reports are attached as Ex. 4 to Defendants' Evidentiary Submission.

16.     After the initial test result, plaintiff returned to visit Dr. Bauer again, and at that time he told plaintiff the results were abnormal and such results meant she might have cancer.  (Plt. Depo., p. 54, ln. 7 - p. 55, ln. 22).  Dr. Bauer told plaintiff he had to test further.  (Plt. Depo., p. 57, ln. 6-22).  Plaintiff described her conversation with Dr. Bauer: "He didn't tell me I had cancer.  He said we have to check.  That's when he scheduled me for outpatient."  (Plt. Depo., p. 57, ln. 17-19).

> Question:   Do you recall anything else Dr. Bauer said to you the second visit?
>
> Answer:   Just that he had to follow up - you know, on the results.  He had to see - test further because it could mean that it could mean something.  He was just wanting to make sure that - you know, that it wasn't cancer.
>
> Question:   He wanted to do further testing to try to make sure you didn't have cancer?
>
> Answer:   That's correct.

(Plt. Depo., p. 58, ln. 11-21).

17.     On June 7, 2005, Dr. Bauer collected specimens from plaintiff's right kidney, left kidney and a bladder wash.  (06/07/05 U.S. Labs Reports).  These specimens were sent to U.S. Labs' Fountain Valley facility for further FISH analysis.  (Id.).

---

[5]     Plaintiff sued Esoterix, Inc., as well as U.S. Labs.  Plaintiff has presented no evidence that Esoterix, Inc., had any involvement in any of the FISH analysis that are the bases of plaintiff's complaint.  For this reason alone, Esoterix, Inc., should be dismissed.  Esoterix, Inc., should also be dismissed for the same reasons as U.S. Labs as set forth in this brief.

18.    All three specimens were reported as abnormal by U.S. Labs. (06/07/05 U.S. Labs Reports).  After these FISH test results came back abnormal, Dr. Bauer told plaintiff they were abnormal and that he needed to do some more procedures.  (Plt. Depo., p. 62, ln. 10 - p. 63, ln. 5).

19.    Dr. Bauer did not tell plaintiff that she had cancer; he just said that she needed more tests.  (Plt. Depo., p. 63, ln. 6 - p. 64, ln. 11).

> Question:    Okay what did he say in that regard if anything?
>
> Answer:    He wanted to go and do some further testing because of the test results that came back with a bladder, and he wanted to see if there was cancer in the kidneys.  So that's when he said he needed to put stents in to be able to retrieve the biopsies.

(Plt. Depo., p. 63, ln. 10-18).

20.    Dr. Bauer continued his course of treatment of plaintiff and on June 17, 2005, inserted stents so as to secure specimens through a right and left renal wash.  (Plt. Depo. p 67, ln. 2-5).  Dr. Bauer submitted these specimens to another lab, Bostwick Laboratories for FISH analysis.  (06/17/05 Bostwick Labs Reports).[6]

21.    One week after this procedure, Dr. Bauer removed the stents.  (Plt. Depo., p. 73, ln. 18 - p. 74, ln. 11).  Because plaintiff experienced substantial pain

---

[6]    06/17/05 Bostwick Labs Reports are attached as Ex. 5 to Defendants' Evidentiary Submission.

after the stents were removed, she was immediately admitted to the hospital for approximately one week.  (Plt. Depo., p. 77, ln. - p. 79, ln. 14).

22.    While plaintiff was in the hospital, she was told the Bostwick Laboratory results were normal and she did not have cancer.  (Plt. Depo., p. 75, ln. 22 - p. 76, ln. 10, p. 92, ln. 4 - p. 93, ln. 12).

23.    Within a month, most of plaintiff's problems relieved themselves. (Plt. Depo., p. 84, ln. 11 - p. 85, ln. 10).

24.    This was before plaintiff started her job at Dadeville Elementary in August, 2005.  (Plt. Depo., p. 86, ln. 4 - p. 87, ln. 19).

### E.    Plaintiff's Knowledge About FISH

25.    Plaintiff does not remember ever looking at the FISH reports.  (Plt. Depo., p. 48, ln. 6 - p. 49, ln. 3).

26.    Whatever she was told about the FISH reports or results came from Dr. Bauer.  (Plt. Depo., p. 49, ln. 4-8).

27.    Plaintiff has had no contact with U.S. Labs, Esoterix or Bostwick Laboratories.  (Plt. Depo. p. 47, ln. 2 - p. 48, ln. 5).

28.    Indeed, plaintiff does not know what is a FISH analysis.  (Plt. Depo., p. 49, ln. 9-15).

29.    Dr. Bauer never discussed with plaintiff why her results came back abnormal.  (Plt. Depo., p. 91, ln. 21 - p. 92, ln. 3).

30.    Plaintiff filed her lawsuit because she was curious:  "I just - I'm curious.  I mean, I want to know why the tests came back not just once or twice, but three times with abnormal readings."  (Plt. Depo., p. 96, ln. 10-13).

### F.    U.S. Labs FISH Analysis

31.    The U.S. Labs' Fountain Valley facility is one of the largest reference laboratories in the nation.  (Yue Depo., p. 33, ln. 4-9).[7]

32.    All of U.S. Labs' technicians are certified and are the most experienced technicians available.  (Yue Depo., p. 33, ln. 1-18).

33.    The laboratory follows strict quality control processes.  (Yue Depo., p. 33, ln. 15-18).

34.    Nobody has ever challenged a FISH analysis result from this reference lab in the past.  (Yue Depo., p. 76, ln. 1-8).

35.    With respect to the four U.S. Labs' FISH analysis, Dr. Changjun Yue performed the urine analysis and Dr. Mariam Rahamizadeh, M.D., performed the bladder wash, left kidney and right kidney analyses.  (Answer to Interrog. #2).[8]

---

[7]    The Deposition of Changjun Yue, M.D., Ph.D. is attached as Ex. 6 to Defendants' Evidentiary Submission.

[8]    Defendants' Answer to Plaintiff's Interrogatory No. 2 is attached as Ex. 7 to Defendants' Evidentiary Submission.

36.    At the time of the FISH analyses, Dr. Rahamizadeh was a Board certified clinical and anatomical pathologist licensed to practice medicine in the State of California.  (Dr. Yue Decl. ¶ 3).

37.    Dr. Changjun Yue is a licensed medical doctor and a Board certified clinical and anatomical pathologist with a Board certified subspecialty of hematopathology.  (Dr. Yue Expert Report ¶ 1; Yue Depo., p. 13, ln. 13-16).

38.    Dr. Yue is trained and experienced in the field of a pathologist, including the interpretation of UroVysion FISH tests.  (Dr. Yue Expert Report ¶¶ 1-2; Yue Depo., p. 9, ln. 13-16, p. 11, ln. 17 -24).

39.    Dr. Yue is familiar with the standard of care for medical technologist and pathologists for performing and interpreting UroVysion FISH tests and has been since prior to 2005.  (Dr. Yue Expert Report ¶ 2).

40.    Dr. Yue has reviewed the four U.S. Labs' FISH tests at issue in this case.  It is Dr. Yue's opinion to a reasonable degree of medical certainty based on his knowledge, training and experience that these tests were performed in accordance with the standard of care required of medical technologists and pathologists under similar conditions and like surrounding circumstances.  (Dr. Yue Expert Report ¶ 7).

41.    Dr. Daynna J. Wolff, Ph.D., is a Professor of Pathology and Laboratory Medicines at the University of South Carolina and is the Director of

Clinical Cytogenetics and Molecular Pathology Laboratories. (Dr. Wolff Expert Report ¶ 1).

42.    Dr. Wolff obtained American Board of Medical Genetics certification in cytogenetics and molecular genetics in 1996 and has been performing and interpreting FISH tests since 1991. (Dr. Wolff Expert Report ¶ 1).

43.    Dr. Wolff interprets the results of approximately 1000 UroVysion FISH tests annually. (Dr. Wolff Expert Report ¶ 2).

44.    Dr. Wolff has been actively involved in research projects using the UroVysion tests, has authored a manuscript that describes the clinical utility of UroVysion and has been invited to give several seminars on UroVysion. (Dr. Wolff Expert Report ¶ 2).

45.    Dr. Wolff has reviewed the UroVysion reports from U.S. Labs for plaintiff and is of the opinion that laboratory performed the testing and reported results in accordance with the general acceptable standards for such tests. (Dr. Wolff Expert Report ¶ 4).

46.    Dr. Wolff opines that all of the test controls and quality assurance measures appear proper and in accordance with generally acceptable laboratory standards and guidelines. (Dr. Wolff Expert Report ¶ 4).

48.    When conducting the FISH analysis, it is not necessary to identify twenty-five morphological abnormal cells once four or more abnormal cells have

been identified.  (Yue Depo., p. 59, ln. 20 - p. 61, ln. 5, p. 69, ln. 24 - p. 70, ln. 9, p. 76, ln. 22 - p. 79, ln. 18).

49.    There is no evidence that the fluorescent light bulbs used in the FISH analyses were defective or impacted the results of the test.  (Dr. Yue Decl. ¶ 4).

### G.    Bostwick Laboratory Sample

51.    The Bostwick Laboratory sample was received in the Bostwick Laboratory four days following the specimen collection and this delayed delivery to the laboratory may have compromised the specimen.  (Dr. Wolff Expert Report ¶ 5).  Specimens should be delivered as soon as possible after collection to minimize the death of pertinent cells.  (Id.).  UroVysion FISH test is a screening test that is used to identify individuals that are in need of more intensive clinical follow up and is not a definitive diagnostic test.  (Dr. Wolff Expert Report ¶ 6). Thus, it is not surprising that specimens taken at different times and processed by different laboratories could have conflicting results.  (Id.).  There are several reasons why specimens may yield positive UroVysion results when there is not a detectable cancer (false positive result).  (Id.).  In some cases, patients with acute infections shed excessive amounts of normal superficial urothelial cells that can have an abnormal signal pattern although they are not cancerous.  (Id.).  In addition, cells may undergo abnormal cell division, resulting in normal cells with an abnormal FISH signal pattern.  (Id.).  It has been documented that FISH testing

may yield positive results up to one year before there is a large enough tumor to be detected by imaging. (Id.).

52. Further, the treatment that Dr. Bauer provided plaintiff in the summer of 2005 was appropriate based on the conditions about which plaintiff complained regardless of the U.S. Labs' FISH results. (Dr. Bivins Expert Report ¶ 4).[9] Plaintiff's medical related complaints raised in the summer of 2005 cannot affirmatively be attributed to the procedures performed by Dr. Bauer as opposed to plaintiff's general medical condition. (Id.).

## III.   ARGUMENT

### A.   Summary Judgment Standard

Summary judgment for defendants is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact regarding plaintiff's claims and that defendants are entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for plaintiff. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Plaintiff must identify the evidence on file in the case that establishes the absence of any genuine issue of material fact. Celotex, 477 U.S. at 323.

---

[9]   The Declaration of Vincent Michael Bivins, Ph.D. and attached Expert Report are attached as Ex. 8 to Defendants' Evidentiary Submission.

Once defendants have made their initial showing, plaintiff must offer evidence sufficient to demonstrate the existence of the required elements of her case. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000). The relevant rules of substantive law dictate the materiality of a disputed fact. Id. Conclusory assertions, unsupported by specific facts, presented in affidavits opposing the motion for summary judgment are insufficient to defeat a proper motion for summary judgment. Lujan v. National Wildlife Fed'n, 497 U S. 871, 888 (1990).

## B.    Alabama Substantive Law Governs Plaintiff's Claims

As this Court noted in Billingsley v. LabCorp, Inc., No. 2:05-cv-157-WKW, 2006 WL 2559819, at *3 (M.D. Ala. Sept. 5, 2006), where the Court's jurisdiction is founded upon the diversity of citizenship of the parties, it is bound to apply the substantive law of the state in which it sits. Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). Erie applies to questions regarding choice of law, so that a court sitting in diversity must apply the conflict-of-law rules of the forum state -- in this case, Alabama. Strochak v. Federal Ins. Co., 109 F.3d 717, 719-20 (11th Cir. 1997) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). Because

plaintiff's claims sound in tort, Alabama's choice of law rules require the Court to apply Alabama law:  "*Lex loci delicti* has been the rule in Alabama for almost 100 years.  Under this principle, an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred."  Fitts v. Minnesota Min. & Mfg. Co., 581 So. 2d 819, 820 (Ala. 1991).

## C.    The AMLA Applies To Plaintiff's Claims Against Defendants

The Alabama Medical Liability Act ("AMLA") governs medical malpractice actions in the State of Alabama.  See ALA. CODE §§ 6-5-480, et seq., 6-5-540, et seq.  The AMLA applies to all actions for injury, damages, or wrongful death, "whether in contract or in tort, against a health care provider for breach of the standard of care…."  ALA. CODE § 6-5-548(a).  "An entity is subject to liability under the AMLA if it falls within the definition of a 'health care provider' as set forth in the AMLA."  Billingsley, 2006 WL 2559819, at *4.  "Health Care Provider" is defined by the AMLA as "[a] medical practitioner, dental practitioner, medical institution, physician, dentist, hospital, or other health care provider as those terms are defined in Section 6-5-481."  ALA. CODE § 6-5-542(1).  Looking to section 6-5-481(8), it is clear that defendants qualify as other health care provider: "Any professional corporation or any person employed by physicians, dentists, or hospitals who are directly involved in the delivery of health care services."  ALA. CODE § 6-5-481(8).  This Court, as well as the Alabama Supreme Court, has held

that "a medical reference laboratory, such as [U.S. Labs], is within the definition of 'other health care provider' and is subject to the AMLA." Billingsley, 2006 WL 2559819, at *4 (citing Anderson v. Alabama Reference Labs., 778 So. 2d 806 (Ala. 2000)); see also Marsh v. Wenzel, 732 So. 2d 985 (Ala. 1998); Guthrie v. Bio-Medical Labs., Inc., 442 So. 2d 92 (Ala. 1983). In Billingsley, this Court applied the AMLA to claims against LabCorp involving the screening of a urine specimen which was "directly linked" to the doctor's treatment and evaluation of the plaintiff for substance abuse. Billingsley, 2006 WL 2559819, at *4. The plaintiff's doctor employed LabCorp to test the urine specimen, and the test was "an integral part of [the doctor's] delivery of health care services to [the plaintiff]." Id.

The facts of the instant case are nearly identical to those of Billingsley. Dr. Bauer, as plaintiff's treating physician, collected four different urine samples from plaintiff and sent them to U.S. Labs for analysis. (U.S. Labs Reports). Dr. Bauer's purpose for engaging the services of U.S. Labs and sending the specimens to it for testing was inarguably "directly linked" to his diagnosis and treatment of plaintiff's medical condition. See, e.g., Billingsley, 2006 WL 2559819, at *4; Anderson, 778 So. 2d at 810. Therefore, defendant's testing of the specimens was "an integral part of [Dr. Bauer's] delivery of health-care services" to plaintiff. Anderson, 778 So. 2d at 810. For these reasons, defendants qualify as "other health care provider," and each of plaintiff's claims are governed by the AMLA.

D.     **Plaintiff Cannot Meet Her Burden Under The AMLA Because She Has Not Identified An Expert To Testify As To The Standard Of Care, U.S. Labs' Alleged Deviation From That Standard, Or A Causal Connection Between The Alleged Breach And Plaintiff's Injuries**

To establish a claim of medical malpractice under the AMLA, a plaintiff must prove, by substantial evidence, "that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers" in the same area of practice. ALA. CODE § 6-5-548(a); see also Complete Family Care v. Sprinkle, 638 So. 2d 774, 777 (Ala. 1994) (holding that physicians "have the legal duty to exercise the degree of care, diligence, and skill that reasonably competent physicians in the national medical community would ordinarily exercise when acting in the same or similar circumstances.") (citing ALA. CODE § 6-5-484; Bradford v. McGee ex rel. McGee, 534 So. 2d 1076 (Ala. 1988)). To find liability in a medical malpractice case in Alabama, "there must be more than a mere possibility or one possibility among others that the negligence complained of caused the injury. There must be evidence that the negligence probably caused the injury." McAfee ex rel. McAfee v. Baptist Med. Ctr., 641 So. 2d 265, 267 (Ala. 1994) (quoting Baker v. Chastain, 389 So. 2d 932, 934 (Ala. 1980)) (internal citations omitted); see also Rivard v. University of Ala. Health Servs. Found., P.C., 835 So. 2d 987, 988 (Ala. 2002); Bradford v. McGee ex rel. McGee, 534 So. 2d 1076, 1079 (Ala. 1988). Plaintiff must establish her case by

presenting "evidence which would convince an unprejudiced thinking mind of the truth of the fact to which the evidence is directed."  ALA. CODE § 6-5-542(5). Under this heightened burden of proof, she must demonstrate: (1) the appropriate standard of care; (2) that defendants deviated from the appropriate standard of care in performing the UroVysion FISH tests on the specimens provided by Dr. Bauer; and (3) a proximate causal connection between U.S. Labs testing and her alleged resulting injuries.  See Rivard, 835 So. 2d at 988; Hauseman v. University of Ala. Health Servs. Found., 793 So. 2d 730, 734 (Ala 2000); Looney v. Davis, 721 So. 2d 152, 157 (Ala. 1998).

### i.    U.S. Labs' Experts Demonstrate That It Complied With The Applicable Standard Of Care

Four of plaintiff's specimens were sent by Dr. Bauer to U.S. Labs.  Each specimen was reported abnormal.  (U.S. Labs Reports).  As demonstrated by the testimony of Dr. Yue and Dr. Wolff, the FISH analysis were performed correctly in accordance with the standard of care for medical technologists and pathologists. Dr. Yue opines that "to a reasonable degree of medical certainty, based on [his] knowledge, training and experience, [] the tests were performed in accordance with the standard of care required of medical technologists and pathologists under similar conditions and like surrounding circumstances."  (Dr. Yue Expert Report ¶ 7).  Dr. Wolff has reviewed the laboratory documents and UroVysion reports from U.S. Labs for plaintiff and she is "of the opinion that the laboratory

performed the testing and reported results in accordance with the general acceptable standards for such tests. All of the test controls and quality assurance measures appeared proper and in accordance with generally accepted laboratory standards and guidelines." (Dr. Wolff Expert Report ¶ 4).

Thus, the undisputed expert medical evidence establishes that the four FISH analyses were conducted in accordance with the applicable standard of care and that there was no breach of that standard of care.

Moreover, the mere fact that plaintiff has not been diagnosed with bladder cancer does not establish U.S. Labs breached the standard of care in reporting abnormal results from the FISH analysis. First, it is undisputed that the UroVysion FISH analysis is not a diagnostic test, but rather a screening test that is used to identify individuals that are in need of more intensive clinical follow up. (Dr. Wolff Expert Report ¶ 6). As Dr. Bivins states: "A positive result is not the equivalent of a cancer diagnosis and a negative result does not necessarily rule out carcinoma." (Dr. Bivins Expert Report ¶ 3). Second, the UroVysion FISH analysis may well have false positive or false negative results. (Dr. Wolff Expert Report ¶ 3). Finally, there are several reasons why specimens may yield positive UroVysion results when there is not a detectable cancer (false positive result). (Id. at ¶ 6). In some cases, patients with acute infections shed excessive amounts of normal superficial urothelial cells that can have an abnormal signal pattern

although they are not cancerous. (Id.). In addition, cells may undergo abnormal cell division, resulting in normal cells with an abnormal FISH signal pattern. (Id.). Further, it has been documented that FISH testing may yield positive results up to one year before there is a large enough tumor to be detected by imaging. (Id.).

Likewise, the fact that the Bostwick Laboratories test results (based on specimens taken at different times than were the specimens analyzed by U.S. Labs and pursuant to different medical procedures (renal washes)) were reported as negative is no evidence that U.S. Labs breached the standard of care as to the specimens it analyzed. It is not inconsistent that subsequent samples taken at a different time pursuant to a different procedure had a different result. (Dr. Wolff Expert Report ¶ 6). As Dr. Wolff noted: The Bostwick Laboratory sample was received in the Bostwick Laboratory four days following the specimen collection and this delayed delivery to the laboratory may have compromised the specimen. (Id. at ¶ 5). Specimens should be delivered as soon as possible after collection to minimize the death of pertinent cells. (Id.). Further, as Dr. Wolff explained, UroVysion FISH test is a screening test that is used to identify individuals that are in need of more intensive clinical follow up and is not a definitive diagnostic test. (Id. at ¶ 6). Thus, it is not surprising that specimens taken at different times and processed by different laboratories could have conflicting results. (Id.).

Moreover, plaintiff has no evidence that the health related issues about which she complains occurred because of procedures necessitated due to U.S. Labs allegedly erroneously reported FISH results. (Dr. Bivins Expert Report ¶ 4).

The undisputed expert medical opinion establishes that U.S. Labs complied with the applicable standard of care in conducting the FISH analysis. Further, these distinguished medical experts have offered reasonable, scientific explanations for why the results of U.S. Labs' FISH analyses were abnormal while subsequent specimens taken at a different time and in a different manner returned a negative result when analyzed by Bostwick Laboratories. This expert opinion demonstrates that U.S. Labs did not breach the applicable standard of care.

### ii.    Plaintiff Has Not Offered Expert Testimony To Provide Substantial Evidence To Support Her Claims

"In a medical-malpractice action, once the defendant health-care provider offers in his, her, or its behalf expert testimony that makes a prima facie showing of a lack of negligence, the health-care provider is entitled to a summary judgment, unless the plaintiff produces substantial evidence indicating negligence." Anderson, 778 So. 2d at 810 (citing Swendsen v. Gross, 530 So. 2d 764, 768 (Ala. 1988)). Under the AMLA, it is well established that a plaintiff must provide substantial evidence in the form of expert testimony as to each of the three elements set forth above. See ALA. CODE § 6-5-548; Dansby v. Hagood, 719 So. 2d 839, 842 (Ala. Civ. App. 1998) (stating that a plaintiff in a medical malpractice

case must utilize medical expert testimony to establish causation); <u>Williams v. Spring Hill Mem'l Hosp.</u>, 646 So. 2d 1373, 1375 (Ala. 1994) (noting that the plaintiff is first required to prove each element of her case through expert testimony).  Exceptions to this rule include where an understanding of the alleged lack of care requires only common knowledge or where the plaintiff employs a generally recognized standard or authoritative medical text or treatise to prove what is or is not proper practice.  <u>See</u>, <u>e.g.</u>, <u>McAfee</u>, 641 So. 2d at 267; <u>Sprinkle</u>, 638 So. 2d at 777; <u>McMickens v. Callahan</u>, 533 So. 2d 579 (Ala. 1988).  As this very Court noted in <u>Billingsley</u>, 2006 WL 2559819, at *6, tests such as the one performed on plaintiff's urine specimens "requires a certain degree of specialized training and knowledge that puts an understanding of the acceptable standard of care beyond the common knowledge of the jury.  Laymen do not have the background and knowledge, without expert testimony, to understand whether or not the [testing] has been properly performed."  "The need for expert testimony does not necessarily depend upon the type of profession which the defendant practices.  Rather, it is dependent upon whether the average person is able to decide without expert testimony whether or not the procedure followed in any given case falls below the acceptable standard." <u>Tuscaloosa Orthopedic Appliance Co. v. Wyatt</u>, 460 So. 2d 156, 161 (Ala. 1984).  Thus, because there is no expert

testimony to the contrary of that offered by defendants, defendants are entitled to summary judgment as a matter of law.

### iii.    U.S. Labs Is Entitled To Summary Judgment Even If This Court Does Not Apply The AMLA To Plaintiff's Claims

Even if this Court finds that the AMLA does not apply to plaintiff's claims of negligence, which it should not, U.S. Labs is likewise entitled to summary judgment under a general theory of negligence under Alabama law.  To prove negligence in Alabama, a plaintiff must establish (1) that the defendant owed a duty to the plaintiff, (2) that the defendant breached that duty, (3) that the plaintiff was damaged or injured, and (4) that the defendant's breach proximately caused damage or injury to the plaintiff.  See Farr Metal, Inc. v. Hines, 738 So. 2d 863 (Ala. 1999).  Plaintiff cannot establish that defendants breached a duty that it owed to her or that any such breach was the proximate cause of her alleged injuries.  The very existence of the breach will require evidence which shows that defendants performed the tests in such a way that it breached the duty that it owed to her.  Additionally, there is no evidence in the record that defendants' actions were the proximate cause of plaintiff's injuries.  In fact, the experts in this case state that the UroVysion FISH test and its results are intended to be used to monitor the recurrence of carcinoma, and not as a diagnostic tool.  (Dr. Yue Expert Report ¶ 4).  The results must be interpreted by a qualified urologist for further clinical

diagnosis.  (Id.).   Thus, abnormal UroVysion results alone could not be the proximate cause of plaintiff's injuries.  Therefore, even if this Court does not apply the AMLA to Plaintiff's claims in this cased, defendants are still entitled to summary judgment as a matter of law.

## <u>CONCLUSION</u>

For the above reasons, this Court should grant summary judgment in favor of defendants, dismiss plaintiff's complaint and tax costs to plaintiff.


s/ Michael L. Lucas
Michael L. Lucas (LUC004)
BURR & FORMAN, LLP
3400 Wachovia Tower
420 North 20th Street
Birmingham, Alabama 35203

Attorney for Defendants
U.S. Labs Fountain Valley, Inc. and
Esoterix, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 5, 2007, I electronically filed the foregoing Defendants' Brief In Support Of Its Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Mark Allen Treadwell
OLIVER & TREADWELL LLP
129 West Columbus Street
Dadeville, Alabama 36853

s/ Michael L. Lucas
OF COUNSEL